BERZON, Circuit Judge, concurring:
I concur in the per curiam opinion in full. I write separately to emphasize why it is essential that the courts scrupulously guard a child's constitutional right to remain at home absent a court order or true exigency.
Taking a child from his or her home, family, and community constitutes a separate trauma, in and of itself. Our cases so recognize, and so ordinarily permit that trauma to occur only after a court determination that the alternative is worse.
Nearly two decades ago, we described the purposes underlying constitutional restrictions *889 on removal of children from their homes without any judicial supervision:
The problem of child abuse is a critical one, with deep personal and social costs. For too long, intra-familial sexual abuse was considered to be a "private" matter. Today, the law is changing....
Because the swing of every pendulum brings with it potential adverse consequences, it is important to emphasize that in the area of child abuse, as with the investigation and prosecution of all crimes, the state is constrained by the substantive and procedural guarantees of the Constitution. The fact that the suspected crime may be heinous-whether it involves children or adults-does not provide cause for the state to ignore the rights of the accused or any other parties. Otherwise, serious injustices may result. In cases of alleged child abuse, governmental failure to abide by constitutional constraints may have deleterious long-term consequences for the child and, indeed, for the entire family. Ill-considered and improper governmental action may create significant injury where no problem of any kind previously existed.
Wallis v. Spencer , 202 F.3d 1126, 1130-31 (9th Cir. 2000).
In other words, for children in neglect and abuse proceedings, "entry into foster care br[ings] them the additional trauma of separation from their homes and often their communities." 42 U.S.C. § 5111(a)(2) (findings supporting the federal Child Abuse Prevention and Treatment Act). "The events of the day of placement constitute a crisis for children because everything in their lives changes and the children are overwhelmed with feelings of abandonment, rejection, worthlessness, guilt, and helplessness." Rosalind D. Folman, "I Was Tooken": How Children Experience Removal from Their Parents Preliminary to Placement into Foster Care , ADOPTION QUARTERLY , no. 2, 1998, at 7, 12 (evaluating the experiences of 90 children removed from their homes as a result of abuse and neglect).
Research confirms that "unexpectedly being snatched by the police or protective service workers traumatize[s] ... children." Id. at 29; see also Amy J.L. Baker et al., Foster Children's Views of Their Birth Parents: A Review of the Literature , 67 CHILDREN AND YOUTH SERVS. REV . 177, 180-81 (2016) (conducting a meta-analysis of 27 studies of the experiences of children and youth in foster care, and finding strong evidence that children remain attached to their homes and families despite abuse). For small children especially, being taken from a home and family by a stranger is a profoundly frightening and destabilizing experience, even if that home and family are flawed.
By assuring close judicial supervision of even temporary governmental interference in the parent-child relationship-absent reasonable cause to believe a true, identifiable, serious exigency exists-our case law implements the Fourth and Fourteenth Amendment's protection of vulnerable children and their parents. Because our decision today reaffirms that critical principle, I concur.
ZOUHARY, District Judge, concurring and dissenting in part:
I concur in the per curiam Opinion regarding the timeliness of the appeal and the district court denial of the motion to seal the summary judgment opinion. But I respectfully dissent from the majority view on the merits of the case. I would affirm the district court order granting summary judgment based on qualified immunity.
*890 Constitutional Violations
A government official who removes a child from parental custody without judicial authorization must have reasonable cause to believe that the child is at risk of abuse during the time necessary to obtain a court order. Rogers v. Cty. of San Joaquin , 487 F.3d 1288, 1294-95 (9th Cir. 2007). Thus, whether an emergency removal is permitted depends on both the amount of time required to obtain a warrant and the nature of the allegations.
In cases where children were not in immediate physical danger and a warrant could be obtained "within hours," this Court concluded that the exigent circumstances requirement was not met. See Rogers , 487 F.3d at 1295 ("There is no indication in the record that so short a delay could have resulted in a significant worsening of the children's physical conditions or an increase in the prospects of long-term harm."); Mabe v. San Bernardino Cty. , 237 F.3d 1101, 1108 (9th Cir. 2001) (holding questions of fact remained on the issues of exigent circumstances, given that the sexual abuse last occurred more than a month before the removal, and a warrant likely could have been obtained within "a few hours").
In this case, Pederson presented evidence that obtaining a court order would take her days, not hours. Assuming, as the majority suggests, that Pederson could have obtained a warrant on a pre-hearing motion for pickup-which neither side argued before the district court-the earliest she could have been heard was the Tuesday following the Labor Day holiday. Against this time line, Pederson had to evaluate the following information:
• A Walmart employee was concerned when he discovered photos of naked children on the Demarees' memory stick, and he notified the police;
• Krause reviewed the photos, interviewed the parents, served a search warrant at the Demarees' residence, and seized various cameras, computers, film, and other photos;
• The children were interviewed and medically examined. During the forensic interview, one of the children reported that their mother "tickle[d] around her private." The interviewer recommended that the children have no contact with their father pending completion of the investigation;[1]
• The physical exams were all normal, but the assessment noted that "[a] normal genital exam does not preclude the possibility of inappropriate sexual contact [sic] the concern described in the history. Many types of sexual abuse do not have associated physical findings significant enough to be found on medical exam;"
• Krause informed Pederson that at least five of the photos met the statutory definition of sexual exploitation of a minor, and he planned to charge both parents with five felony counts of sexual exploitation of a minor;
• Pederson reviewed the edited black and white copies of the photos and determined that the children were nude, with their genitals exposed to the camera, and some of the images appeared posed.
Pederson later explained the significance of her belief that the children (ages five, four, and 19 months) appeared to be posed: "I would be very concerned if children *891 were posing in provocative manners without clothing on themselves. That would concern me as to what they've observed in their ... home."
At the time of the removal, then, Pederson knew that there were "[s]erious allegations of abuse" against the Demarees, which she investigated and corroborated by reviewing the photos, speaking with Shearer about the results of the forensic interview and medical exams, and conferring with Krause about the potential criminal charges. Rogers , 487 F.3d at 1294. These circumstances "usually give rise to a 'reasonable inference of imminent danger sufficient to justify taking children into temporary custody,' " if the children might be at risk during the time required to obtain a removal order. Id.
The majority concludes, and I agree, that the only "articulated" risk to the children is that the parents would take more sexually explicit photos of them. This may not have been the only "articulable" risk, in light of the forensic interview report, but the record is clear that Pederson summarily identified the "sexually explicit pictures" as the basis for the emergency removal. She also provided the parents with a notice informing them that they were under investigation for "sexual abuse - child pornography/exploitation." Nevertheless, viewing the facts in the light most favorable to the Demarees, a jury could conclude that the children faced no immediate danger of abuse, and it was safe to leave them with their parents over the holiday weekend. Accordingly, that same jury could find that Pederson and Van Ness committed a constitutional violation by removing the children under non-exigent circumstances without a court order. I therefore concur in this portion of the per curiam Opinion. But this is not the end of the inquiry.
Clearly Established Law
The second prong of the qualified immunity analysis is whether the right at issue was clearly established. In determining whether a right is clearly established, "[w]e do not require a case directly on point." Ashcroft v. al-Kidd , 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). At the same time, the Supreme Court has "repeatedly told courts-and the Ninth Circuit in particular-not to define clearly established law at a high level of generality." Id. at 742, 131 S.Ct. 2074 (citation omitted). Neither the parties nor the majority identify any circuit precedent that addresses whether an emergency removal is justified under circumstances like these, where the type of abuse alleged is sexual exploitation, and it would take a social worker at least several days to obtain a removal order.
I disagree with the majority's view of Malik v. Arapahoe County Department of Social Services , 191 F.3d 1306 (10th Cir. 1999). In that case, the social worker had a court order (albeit one based on "misrepresentation and omission") to remove the child, and the defendants conceded there was no imminent danger of abuse. Id. at 1311-12. The court therefore devoted little consideration to the question of exigency, see id. at 1315 n.5 :
Our conclusion that disputed facts as viewed by the district court in the light most favorable to plaintiffs-appellees support a conclusion that defendants violated clearly established law by no means restricts the authority of law enforcement and child protective officers to seek protective custody of a child when they have legitimate concerns for the child's safety. Rather, our conclusion hinges upon the district court's finding that "[d]efendants acknowledged Julie was in no imminent danger at the time they sought the order and the facts suggest *892 it was secured only through distortion, misrepresentation and omission."
Further, in Malik , the photos at issue were five months old, and the child's uncle, who took the photos, lived out of state. Law enforcement officials had also been in contact with the child's mother and her attorney for about two weeks before seeking a temporary custody order, which supports the conclusion that they did not consider the case an emergency.
In contrast, in this case, both parents lived in the home and were subjects of an ongoing criminal investigation. They admitted to regularly taking nude photos of the children-in fact, A.J. initially thought Krause wanted to question him about additional photos that were not included in the set obtained from Walmart.[2] CPS then became involved less than twenty-four hours after the photos were first discovered, and Pederson, Van Ness, and Krause all agreed that emergency removal was appropriate under the circumstances.
Despite the absence of authority directly on point, the majority concludes that it was nevertheless "beyond debate" in 2008 that an emergency removal is only justified to protect a child from "imminent physical injury or molestation," and "[t]he risk identified here simply does not meet that standard, as it does not involve physical injury or abuse." Per curiam Op. at 25-26. I respectfully disagree for two reasons.
First, framing the issue in this way overlooks another well-established formulation of the standard, one which is quoted earlier in the Opinion: "Serious allegations of abuse that have been investigated and corroborated usually give rise to a 'reasonable inference of imminent danger sufficient to justify taking children into temporary custody'...." Rogers , 487 F.3d at 1294 (emphasis added) (quoting Ram v. Rubin , 118 F.3d 1306, 1311 (9th Cir. 1997) ). In most cases, a serious allegation of abuse may be synonymous with a risk of physical injury. Yet I do not interpret the majority to suggest that allegations of sexual exploitation or child pornography are not "serious."
Here, Pederson investigated and corroborated a serious allegation of abuse. True, it did not necessarily involve traditional physical injury. But the record reflects that the nature of the concern-sexually explicit photos-is not limited to snapping a picture. In other words, the potential danger was not that the Demarees would take more naked pictures of the girls; rather, the risk was that the parents were sexually exploiting their children. As Pederson explained, inherent in this allegation is the concern that there is more to the situation than meets the eye-for example, that the parents may have posed the children, or that the children may have adopted provocative poses based on behavior observed in the home. Without the benefit of clearer guidance defining the "usual" case, a reasonable social worker could be unsure how to proceed under these circumstances.
Second, the majority treats the nature of the risk and the time required to obtain a warrant as entirely distinct considerations. I do not consider them so easily separated. Ninth Circuit authority in this area rightly focuses on whether the threat to a child's safety is sufficiently "imminent" to justify immediate removal, without waiting for court approval. See, e.g. , *893 Kirkpatrick v. Cty. of Washoe , 843 F.3d 784, 791 (9th Cir. 2016) (en banc) ("[T]he social workers here lacked cause to forgo a warrant if they had adequate time to pursue one through the ordinary judicial process without risking [the child's] well-being."). This is because in the typical case, judicial review is available "within hours." The analysis therefore naturally focuses on whether the allegations of abuse are both severe and urgent enough that it is unacceptable to allow the child to remain in the home for even a short period of time.
This case is unique: no judicial review was available for at least several days. And this fact is both critical and, perhaps, unlikely to be repeated. As the majority correctly notes, certain allegations of abuse or neglect might lead a reasonable social worker to feel comfortable leaving a child in the custody of his parents for just a few hours. See, e.g. , Rogers , 487 F.3d at 1291 (bottle rot and other chronic neglect); Mabe , 237 F.3d at 1104-05 (sexual abuse only taking place at night). But this Court has not had occasion to consider whether those same allegations might be cause for concern if the delay were extended to a few days. No one wants to inflict unnecessary trauma on children, see Concurring Op. of Berzon, J., at 38-39, but surely this worthy consideration must be balanced by protecting their physical well-being in those cases where it is actually threatened. All involved in the child welfare system would be well served by clear legal standards from this Court to assist social workers in making these difficult decisions.
Pederson faced a tough judgment call on that Saturday night: she could err on the side of caution and take the children into temporary custody, or she could wait three days until the courts reopened to seek a removal order. In August 2008, it was clearly established that a child could not be removed from the home without a court order, absent evidence that the child was in imminent danger of abuse. See Kirkpatrick , 843 F.3d at 792 (citing cases). But it was not "beyond debate that the confluence of factors set forth above would not support a finding of exigency." Id. at 793. No Ninth Circuit authority addresses whether removing a child during an ongoing criminal investigation "crosse[s] the line of reasonableness" when the courts are closed for several days, and judicial review is simply not available. Id.
Without fair notice, I would hold that Pederson and Van Ness are entitled to qualified immunity for removing the children without a court order. I therefore respectfully dissent from this portion of the per curiam Opinion.

I agree with the Majority that Hamer v. Neighborhood Housing Services of Chicago , --- U.S. ----, 138 S.Ct. 13, 199 L.Ed.2d 249 (2017), clearly articulated the difference between jurisdictional rules (those grounded in the United States Code) and "mandatory claim-processing rules" which "must be enforced," but, nevertheless, may also be waived or forfeited, and that the rule primarily at question in this case (Rule 4(a)(4) and the effect of the tolling motions listed therein) is a "mandatory claim-processing rule" and not a jurisdictional rule. Id. at 17.

There is no question the Defendants did not waive or forfeit this argument: "The Demarees filed a timely Notice of Appeal (ER 19) as to postjudgment orders (ER 1,3), but not as to the Judgment (ER 4)."